JOHN G. AND CECILIA B. WHITTAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Whittaker v. Commissioner
Docket No. 15802-86
United States Tax Court
T.C. Memo 1992-29; 1992 Tax Ct. Memo LEXIS 31; 63 T.C.M. (CCH) 1811; T.C.M. (RIA) 92029; January 14, 1992, Filed *31 Decision will be entered under Rule 155. Loren W. Hershey, for petitioners. Patricia A. Donahue and Stephen Ianello, for respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659
1982
$ 16,236
$ 812
*
$ 4,871
1983
10,937
547
*
3,281
*32 Respondent also determined that petitioners are liable for increased interest under section 6621(c) (formerly section 6621(d)) for both years. At trial, respondent conceded the addition to tax under section 6659 for 1983 and the section 6659 addition to tax for 1982 with respect to all adjustments except for the adjustment disallowing the investment tax credit claimed by petitioners. After these concessions, the issues for decision are: (1) Whether petitioners are entitled to deductions and investment tax credit with respect to a leased stamp master; (2) whether petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6659; and (3) whether petitioners are liable for increased interest under section 6621(c) (formerly section 6621(d)). FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. Petitioners were residents of Upper Marlboro, Maryland, at the time they filed their petition. John G. Whittaker (petitioner) was employed full-time during the years at issue as a computer systems specialist for the Defense Logistics Agency, Department of Defense. *33 Cecilia B. Whittaker (Mrs. Whittaker) was employed full-time as a file manager for the Department of Commerce, Bureau of the Census. At the time of trial, petitioner had been employed by the United States government for 47 years, and Mrs. Whittaker had been so employed for 34 years. Petitioners reported combined wages from their government employment of $ 81,808 and $ 86,233, respectively, for taxable years 1982 and 1983. Philatelic Leasing, Ltd.
Beginning in 1965 and continuing through 1982, petitioners and their children collected stamps as a hobby. Mrs. Whittaker subscribed to a publication, The Stamp Collector, during 1982 and 1983. Sometime in 1982, petitioner saw an advertisement in the financial section of the Washington Post for a business opportunity involving stamps. Responding to the advertisement, petitioner contacted the office of Robert A. Ness, Tax Shelter Specialists, and was given a schedule of meetings to be held concerning the advertised opportunity. Petitioner attended several meetings in Mr. Ness's office in Potomac, Maryland, and in hotel meeting rooms in Tysons Corner, Virginia, where interested persons were given information about a stamp master *34 leasing program promoted by Philatelic Leasing, Ltd. (Philatelic Leasing). The Philatelic Leasing program offered to prospective investors an opportunity to lease a master plate (the stamp master) from which British local stamps for the islands of Bernera, Eynhallow, and Staffa (all privately-owned islands located off the coast of Scotland) and ancillary products such as calendars, posters, or stationery could be produced. Such local stamps (also called "local carriage labels" in the philatelic industry) are not postage stamps as the term is commonly understood, since they are not recognized as evidence of prepayment of postage by the British government postal system or any other organized postal system operated by a member of the Universal Postal Union (the organization of all United Nations member states which engages in the international transport of mail). The stamps in the Philatelic Leasing program could only be used as postage in the private mailing system of each issuing island. Once mail utilizing these stamps was deposited in the public or governmental British mail system, or any other organized postal system, such mail required the necessary postage of that public carrier. *35 The local stamps, therefore, neither had value nor were recognized by any public governmental mailing system. Accordingly, the bulk of local stamps in the Philatelic Leasing program were issued for sale to collectors rather than for use as postage stamps. The Philatelic Leasing program, as outlined in the Confidential Offering Memorandum (the offering memorandum), was founded upon a 7-year lease of stamp masters to investors, each consisting of photographic color separations from which the various British local stamps would be produced, together with related copyrights. Each of the master plates leased from Philatelic Leasing carried with it the right to print an issue consisting of the following limited editions of stamps: 20,000 sets perforated stamps; 10,000 sets imperforated stamps; 10,000 deluxe sheets; and 20,000 souvenir sheets. The maximum face value of the individual stamps was two British pounds. The offering memorandum suggested that investors contract with an established stamp distributor to arrange marketing of the stamps produced from the leased stamp masters. The offering memorandum described the stamp master leasing activity as highly speculative in nature. *36 The program called for seven annual lease payments of $ 30,000 each for a 2-stamp master, [2] financed largely by nonrecourse notes. The program also included pass-through of the right to claim investment tax credit on the stamp masters, with such credit calculated upon Philatelic Leasing's cost of purchasing the masters from Hambrose Stamps, Ltd. [3] (Hambrose Stamps). Philatelic Leasing's purchase price for a 2-stamp master was $ 150,000. The purchase of the stamp master by Philatelic Leasing was financed in part by notes executed by Philatelic Leasing and guaranteed by its president and sole shareholder, Melvin Hersch. Mr. Hersch was formerly the president of Hambrose Stamps. The notes from Philatelic Leasing to Hambrose Stamps carried simple interest at a rate of *37 9 percent per annum. Philatelic Leasing was obligated to make prepayments on its nonrecourse notes to Hambrose Stamps as it received prepayments from lessees on their nonrecourse notes. The Philatelic Leasing notes were secured by the stamp masters leased to investors by Philatelic Leasing. A substantial portion of the 69-page offering memorandum was devoted to discussion of the Federal income tax aspects of the stamp master leasing program. This section consisted of a 52-page legal opinion and letters prepared by a New York law firm, and confirmation by a New York accounting firm that the two firms had agreed to represent Philatelic Leasing (and any of its lessees that requested representation) in the event the "tax structure" of the stamp leasing transaction was challenged by the Internal Revenue Service. Petitioners, however, were not represented by the New York law firm in this litigation. In 1985, subsequent to petitioners' investment, the United States District Court for the Southern District of New York determined that the stamp master leasing program promoted by Philatelic Leasing was an abusive tax shelter, and the promoters of the shelter were enjoined from further *38 promoting the leasing of stamp masters. This result was affirmed by the United States Court of Appeals for the Second Circuit. [4] In granting injunctive relief to the government, the District Court found that the stamp masters leased by Philatelic Leasing in 1982 were grossly overvalued within the meaning of section 6700.
On October 30, 1982, petitioners agreed to lease a 2-stamp master from Philatelic Leasing for a total consideration of $ 210,000, consisting of $ 7,500 cash, a promissory note in the amount of $ 7,500 due May 15, 1983, another note in the amount of $ 15,000 (the second note), and 6 additional notes, each in the principal amount of $ 30,000. These notes, except for the first note, were due February 1, 1990, and bore simple interest at a rate of 10 percent per annum. No interest payment was due on the notes, due February 1, 1990, until the principal *39 of each note, and all other notes executed pursuant to the lease agreement, had been paid in full. All of the notes due February 1, 1990, were secured by the products derived from the stamp master and 50 percent of the proceeds from sales of such products. The second note provided that the maker was personally liable for the principal amount but not for any interest or costs in connection with any security interest relative to the note. One of the $ 30,000 notes (the third note) specified that the maker had personal liability for only $ 6,000 of the $ 30,000 principal amount but no such liability for the remainder of the principal or any interest or costs. The other five $ 30,000 notes were each labeled "Nonrecourse Note" and provided that the maker had no personal liability for any principal, interest, or costs. The cash and notes represented lease payments for the stamp master beginning October 1, 1982, through and including October 1, 1988. On May 9, 1983, petitioners paid the $ 7,500 note executed October 30, 1982, in addition to the $ 7,500 cash paid at the time they entered into the program. None of the other notes were paid. Petitioners received no income from the sale *40 of stamps in 1982 and 1983. For the period January 1, 1984, through June 30, 1984, the sale proceeds of petitioners' stamps totaled $ 21.60. Petitioners received $ 2.70 from the distributor on May 17, 1984, from the sale of their stamps. From July 1, 1984, to December 31, 1986, petitioners did not receive proceeds from the sale of their stamps. There were at least 442 stamp images from which petitioners and other potential investors could select to lease. The image originally selected by petitioners for the 2-stamp master had already been leased to another investor. Petitioner then agreed to allow Philatelic Leasing to select an image for petitioners' stamp master. The image selected was described as "Gulls" and included depictions of terns [5] on local stamps for the Scottish island of Bernera. *41 Petitioners never saw the stamp master they leased and obtained no insurance with respect to it. They never obtained an independent appraisal of the stamp master. They received, however, three appraisals from Philatelic Leasing approximately six months after entering into the lease. These appraisals each concluded that the value of the stamp master was $ 292,500. A fourth appraisal, also from Philatelic Leasing, stated that, at wholesale, the stamps would provide revenue of $ 110,000 from ancillary product sales over a 10-year period. These appraisals were received in 1983, after petitioners' 1982 tax return had been filed, and were not relied upon by petitioners in claiming deductions and investment credit with respect to their leased stamp master. The first printing of stamps from petitioners' master was done in 1983. Petitioners paid $ 2,000 to Philatelic Leasing for printing costs for production of 40,000 stamps. Petitioner attended two meetings, in December 1982 and February 1983, at which stamp distributors presented proposals to market British local stamps. By letter dated January 10, 1983, petitioner requested that Philatelic Leasing supply him with a list of recommended *42 stamp distributors. On June 11, 1983, petitioners entered into a 10-year distribution agreement with International Collectors Guild, Ltd. (International Collectors Guild). A typical stamp distribution agreement in the industry extended for two to three years with a provision for renewal. Subway Stamp Shop, Inc., an affiliated corporation of International Collectors Guild, had an active customer list of approximately 25,000 customers. Petitioners agreed to pay a $ 2,000 distribution fee to International Collectors Guild. Additionally, the distributor was to receive 25 percent of the gross receipts derived from the wholesale price of the stamps. Under the distribution agreement, petitioners' stamps were to be sold at retail for no less than 120 percent of their face value. Petitioners' stamps were each priced for sale in the following amounts: Perforated sets
$ 1.80
Souvenir
$ 1.80
Imperforated
$ 9.00
Deluxe Sheets
$ 7.20
Petitioners never met with the distributor to discuss a distribution plan. Under the distribution agreement, petitioners had the right to sell or distribute no more than 15 percent of the stamps themselves; however, petitioners never attempted to *43 market any of the stamps on their own. Neither petitioners nor the distributor sold or attempted to sell any ancillary products. Petitioners had no experience marketing stamps when they leased the stamp master. Petitioners had never been employed in any stamp-related business. Petitioners did not inquire into the experience of Philatelic Leasing's promoters or investigate the history or success of the promoters' prior business dealings. Petitioners did not negotiate the lease price or other terms of the agreement with Philatelic Leasing; all prices, terms, and conditions were set by the lessor. Petitioner testified that he intended to become personally involved in the stamp activity upon his retirement. Expert Testimony
James A. Willms testified as an expert witness for respondent on the value of the stamp master. Petitioners presented no evidence of the value of the stamp master. Mr. Willms had 17 years' experience in marketing and management, which included nine years in the philatelic field. At the time of trial, Mr. Willms was Executive Vice President, Director, and Vice Chairman of the Board of Unicover Corporation, Cheyenne, Wyoming. The Unicover Corporation *44 is an international direct marketer of stamps and other philatelic products, coins, fine porcelain, and art prints, and is the largest private concern in North America dedicated to stamp collecting. In Mr. Willms' opinion, the stamp master leased by petitioners had no value because it would not be possible to profitably market stamps produced from the master. Based upon his experience in marketing collector stamps, Mr. Willms testified that the cost of producing and marketing the stamps would exceed any anticipated revenue from sales because the market for such stamps was very limited. In his opinion, the proposed issue of 60,000 local stamps was large for that type of collector stamp because stamps become more valuable if scarce. No item or collection sold by Unicover Corporation prior to 1983 exceeded 65,000. Mr. Willms also stated that the quality of the printing, art, and perforations on petitioners' stamps was poor, which would adversely affect their value as collectible stamps. Mr. Willms stated that the $ 20 at which petitioners' 4-stamp sets were priced, which consisted of one perforated, one imperforated, one deluxe, and one souvenir stamp, was very high for this type *45 of stamp. Petitioners' 1982 and 1983 Federal Income Tax Returns
Petitioners' 1982 and 1983 Federal income tax returns were prepared by a certified public accountant, Howard L. Carter. Mr. Carter accompanied petitioner to at least one Philatelic Leasing meeting conducted by Mr. Ness. Petitioners claimed deductions related to the stamp master on Schedule C of their 1982 and 1983 returns, which they identified as "Whittaker Enterprises". On the 1982 Schedule C, petitioners claimed a $ 2,594 loss from the stamp master leasing activity, consisting of $ 94 interest expense and $ 2,500 designated as "lease payment". Petitioners also claimed an investment tax credit of $ 15,000 on their 1982 tax return with respect to the leased stamp master. In their brief, petitioners conceded the investment tax credit claimed because the stamp master was not placed in service in 1982 and "otherwise does not properly qualify for the credit.". On their 1983 tax return, petitioners claimed a Schedule C loss of $ 30,403 from the stamp master leasing activity, consisting of $ 403 interest expense and $ 30,000 designated as "lease payment". Petitioners received a prefiling notice from the Internal *46 Revenue Service dated February 16, 1984, regarding Philatelic Leasing which stated, "based upon our review of that promotion, we believe the purported deductions and/or credits claimed are not allowable". Petitioners filed their 1983 tax return claiming the $ 30,403 loss after receiving this notice. Respondent determined that petitioners are not entitled to the deduction and investment tax credit claimed on their 1982 and 1983 income tax returns in connection with Philatelic Leasing. Respondent also determined additions to tax and increased interest pursuant to sections 6653(a)(1) and (2), 6659, and 6621(c). ULTIMATE FINDING OF FACT The value of the stamp master leased by petitioners from Philatelic Leasing was zero. OPINION Issue 1: Claimed Deductions and Investment Tax Credit Relating to Philatelic Leasing
The primary issue for decision is whether petitioners are entitled to deductions and credits related to their interest as lessee of a stamp master. Petitioners bear the burden of proof. Rule 142(a); . Respondent determined that the transaction entered into by petitioners lacked economic substance and was *47 a sham that should, therefore, be disregarded for tax purposes. In the alternative, respondent argues that petitioners were not engaged in a trade or business for profit nor were they engaged in an activity for the production of income. Petitioners maintain that they had the requisite profit objective and that the program they invested in was economically viable because they honestly believed they would be able to earn more from the sale of stamps than the amounts they invested in the program. In making this argument, petitioners repeatedly imply in their brief that only the actual cash they expended (a total of $ 18,403 for both 1982 and 1983, and an additional $ 1,500 which is not at issue because it was paid during 1984) is relevant in determining the profit potential of their stamp business. Similarly, in his testimony at trial, petitioner referred to the"total investment" as $ 19,000. This approach is incongruous with petitioners' claims on their tax returns of an investment tax credit using $ 150,000 as the basis of the stamp master and deductions for annual lease payments consistent with a total leasehold cost of $ 210,000 over a 7-year term. [6] Having entered into the *48 lease and claimed tax benefits based upon the Philatelic Leasing model, petitioners may not now disregard the form of the transaction in order to establish profit objective. Moreover, petitioners recovered less than $ 25 of the cash expended through sales of the stamps. They presented no evidence from which the Court might conclude that petitioners could recoup their cash outlay by the venture's financial success. To establish that the transaction is not a sham and, therefore, to be entitled to deductions from the transaction, petitioners must prove that the transaction had a legitimate business purpose and economic substance. , *49 affd. in part and revd. in part . In determining whether the instant transaction is a sham we look to business purpose and economic substance. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91-92. We first address whether petitioners had a business purpose in entering into the lease. Petitioner testified that he entered into the transaction because he wanted to start a business that he could actively participate in after his retirement from government service and then pass on to his children. He stated that his interest in the program was not motivated by tax considerations but by his belief that the opportunity offered by Philatelic Leasing would be profitable. Despite this testimony, petitioners' actions, or lack thereof, reveal their indifference to profit considerations. Prior to their investment in the Philatelic Leasing program in October 1982, petitioners' involvement in the stamp collecting industry was limited to casual stamp collecting as a hobby. Petitioners neither had experience nor expertise in producing or marketing stamps. Nevertheless, they did not seek advice from knowledgeable persons *50 in the stamp industry. They also entered into the lease agreement, paid $ 7,500 in cash, and signed notes for an additional $ 202,500 based solely upon representations in the offering memorandum and information obtained from Philatelic Leasing's promoters. The promotional materials and offering memorandum which petitioners relied upon in evaluating the business potential of the transaction emphasized the tax aspects of the program rather than its profit potential. Petitioners did not independently investigate the stamp industry, the market for British local stamps, or the viability of the proposed venture as outlined in the promotional materials. At the time petitioners entered into the transaction, they had not seen appraisals of the stamp master they leased, although the promotional materials indicated that two appraisals would be provided by Philatelic Leasing. There is no evidence that petitioners obtained information concerning possible distribution arrangements for the stamps or ancillary products to be produced from the leased master prior to entering into the lease. Petitioners made no effort to obtain data from which they could analyze the possibility of making an economic *51 profit from the venture. There is no evidence that petitioners formulated a business plan, made projections of profit and loss, or calculated a break-even point for the proposed venture prior to or after entering into the agreement with Philatelic Leasing. Petitioners did not negotiate any of the terms of the lease or notes with Philatelic Leasing. After entering into the lease, petitioners did little to promote sales of the stamps produced by the stamp master. Both petitioners continued in their full-time jobs as employees of the United States government. Petitioners entered into an agreement with a distributor without negotiating the terms of the agreement and took no action to change marketing strategy when the stamps did not sell. On this record, petitioners have not convinced the Court that at the time they entered into the lease transaction they had the requisite business purpose. We next address whether the transaction had economic substance. This inquiry is objective and requires an analysis of the transaction as a prudent businessman would to ascertain whether it had any economic substance apart from its beneficial tax consequences. . *52 It is well established that a transaction which is devoid of economic substance is not recognized for tax purposes. . Petitioners contend that they entered into the transaction to make a profit from the sale of stamps, not to save taxes. Further, they claim that such motivation was sufficient to establish their right to the losses claimed from the venture even if the program they invested in was without economic substance or a sham. This argument is without merit. Subjective intent cannot supply economic substance to a business transaction, and the mere presence of an individual's subjective profit objective will not require the Court to recognize for tax purposes a transaction which lacks economic substance. . In determining whether a transaction has economic substance, a taxpayer's subjective statement as to his profit objective in entering into the transaction is relevant, but greater weight is placed on objective facts demonstrating a realistic potential for profit. A realistic potential for profit exists "when the transaction *53 is carefully conceived and planned in accordance with standards applicable to a particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment". . Considering the record as a whole, we hold that petitioners have not carried their burden of proof with respect to establishing economic substance. As stated above, in 1985, the United States District Court enjoined Philatelic Leasing from promoting the stamp master leasing program at issue herein, see , affd. , and found that the stamp masters promoted by Philatelic Leasing were grossly overvalued within the meaning of section 6700. Based on the testimony of respondent's expert witness, Mr. Willms, we conclude that the value of the stamp master herein, for which petitioners agreed to pay $ 210,000 primarily with nonrecourse notes, is zero. Thus, the consideration of $ 210,000 petitioners agreed to pay for the lease of the stamp master greatly exceeded the fair market value of the *54 property and rights received. The lease price and other terms were set by the lessor without effective arm's-length negotiation between the parties. The financing structure allowed petitioners to pay a relatively small amount of the total lease price in cash, and a significant portion of the lease price was represented by nonrecourse notes. The market for stamps produced from the master was very limited, and sales of the stamps or ancillary products could not reasonably be expected to cover the cost of the lease and would not have produced a profit. We conclude that petitioners failed to establish that their stamp master leasing activity had economic substance. Accordingly, respondent's determination that petitioners are not entitled to the claimed deductions and investment tax credit with respect to the lease is sustained. Claimed Interest On Note
On their 1983 Federal income tax return, petitioners deducted $ 403 as interest paid on the $ 7,500 note due May 15, 1983. In Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96, the Fourth Circuit Court of Appeals held that interest paid on recourse debt incurred in connection with a sham transaction *55 is deductible if the recourse notes are genuine obligations. The $ 7,500 note executed by petitioners is recourse on its face, and petitioners paid the principal amount of the note and $ 402.74 in interest in 1983. Accordingly, we hold that, although the note was given in connection with a sham transaction, it represented a genuine obligation upon which principal and interest were paid. Petitioners are, therefore, entitled to deduct the interest paid on this note in 1983. Petitioners also deducted $ 94 as interest paid on their 1982 tax return but did not establish with respect to what, if any, obligation such amount was incurred, or that such amount was actually paid. Accordingly, petitioners are not entitled to an interest deduction of $ 94 for 1982. Issue 2: Sections 6653(a)(1) and (2) and 6659 Additions to Tax
The next issue for decision is whether petitioners are liable for the sections 6653(a)(1) and (2) and 6659 additions to tax. Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition *56 to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. . There was no objective support for the value of the stamp master upon which petitioners claimed deductions and investment credit. Furthermore, petitioners conceded that the stamp master was not placed in service in the year the investment credit was claimed. Petitioners claimed deductions related to an activity after being notified that respondent disallowed such deductions. Petitioners' actions were not those which reasonable and prudent persons would have taken under the circumstances. Accordingly, we hold that the deficiency resulting from the lease of the stamp master is due to negligence and intentional disregard of rules and regulations. Petitioners are, therefore, liable for the additions to tax under section 6653(a)(1) and (2). Respondent also determined that petitioners are liable for the addition to tax for valuation overstatement under section 6659. *57 In , we held that deductions for advance rentals did not involve a claim as to the value of underlying property and, therefore, were not subject to the valuation overstatement addition. Respondent conceded at trial that the addition to tax under section 6659 neither applies to the deficiency determined for 1983 nor to the portion of the deficiency determined for 1982 which is attributable to items other than disallowance of the investment tax credit. Section 6659(a) imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement". Section 6659(c) provides that "there is a valuation overstatement if the value of the property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis". If the claimed valuation exceeds 250 percent of the correct value, then the addition to tax is equal to 30 percent of the underpayment. Sec. 6659(b). Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See , *58 affd. . On brief, petitioners concede that the stamp master was not placed in service during 1982, the year they claimed the investment tax credit. This concession, if accepted by the Court, would result in the disallowance of the investment tax credit on grounds other than overvaluation, rendering the overvaluation addition inapplicable. See ; In both , and , concessions of entitlement to the investment tax credit were made prior to the trials in those cases. When taxpayers have sought to avoid the addition to tax under section 6659 by conceding the investment tax credit issue on brief, the Court has declined to accept the concession. ; ; . Similarly, the Court here is disinclined to allow petitioners to avoid the *59 addition to tax for valuation overstatement by conceding the investment credit on brief. Petitioners' claim of the investment tax credit on their 1982 return is attributable to an asset having a zero basis. Accordingly, because Philatelic Leasing and petitioners overvalued the stamp master by more than 250 percent, we conclude that petitioners are liable for the section 6659 addition to tax for valuation overstatement at the rate of 30 percent of the underpayment of tax attributable to the disallowed investment credit for 1982. The section 6659 addition to tax does not apply, however, with respect to the underpayments in 1982 and 1983 attributable to disallowance of deductions for lease payments or interest. . This has been conceded by respondent. Issue 3: Section 6621(c) Increased Interest
Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment in excess of $ 1,000) in a taxable year "attributable to one or more tax-motivated transactions". The increased rate applies to interest accrued after *60 December 31, 1984, even though the transaction was entered into prior to the enactment of section 6621(c). , affd. without published opinion . Tax-motivated transactions include valuation overstatements and deductions disallowed from activities not entered into for profit. Sec. 6621(c)(3). Congress specifically amended section 6621(c)(3)(A), adding to the list of tax-motivated transactions "(v) any sham or fraudulent transaction". [7] Transactions devoid of business purpose and economic substance are sham transactions for purposes of section 6621(c)(3)(A)(v). . The evidence is unequivocal that the Philatelic Leasing program had no economic substance, and the underpayments attributable to the program exceeded $ 1,000. Accordingly, the increased interest rate applies to the underpayment attributable to all credits and deductions taken with respect to the Philatelic Leasing program. *61 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
2. The offering memorandum also described leases of 4-stamp, 6-stamp, and 8-stamp masters. Petitioner's agreement with Philatelic Leasing was for a 2-stamp master. ↩
3. Hambrose Stamps, Ltd., acquired the stamp masters from Global International, Ltd.↩
4. See , affd. .↩
5. Webster's Ninth New College Dictionary, 1985 edition, defines "tern" as "any of numerous sea gulls (Sterna and related genera) that are smaller and slenderer in body and bill than typical gulls and have narrower wings, often forked tails, black cap, and white body."↩
6. As noted in the findings of fact, petitioners conceded in their brief the investment credit for 1982 based on the theory that the stamp master was not placed in service or did not qualify for the credit. Petitioners continue to maintain that the deductions taken in both years with respect to lease payments and interest should be upheld in full.↩
7. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective for interest accruing after December 31, 1984, the original effective date of sec. 6621(d).↩